**FREDERICK COUNTY FRUIT GROWERS ASSOCIATION, INC., et al., Plaintiffs,**

v.

**Ann McLAUGHLIN, Sec'y of the Dep't of Labor, and Cedrick Turner, et al., Defendants.**

Civ. A. No. 87–1588.

United States District Court, District of Columbia.

Jan. 17, 1989.

Denying amendment, —— F.Supp. ——.

**1022**

Thomas E. Wilson, Marc Alan Silverstein, Seyfarth, Shaw, Fairweather & Geraldson, Washington, D.C., W.A. Johnston, Ronald J. Brown, Harrison & Johnston, Winchester, Va., for plaintiffs.

Sandra Schraibman, Judry Subar, U.S. Dept. of Justice, Civil Div., for Ann McLaughlin.

Roger Rosenthal, Edward J. Tuddenham, Migrant Legal Action Program, Washington, D.C., Garry G. Geffert, West Virginia Legal Services, Martinsburg, W.Va., Greg-

ory S. Schell, Legal Aid Bureau, Inc., Salisbury, Md., Michael Guare, Pine Tree Legal Assistance, Bangor, Me., for Cedrick Turner, et al.

## OPINION

CHARLES R. RICHEY, District Judge.

Table of Contents | Page
I. Introduction ................ 1022
II. Facts ..................... 1023
III. Discussion
    A. The Original Action—Summary Judgment is Granted in Favor of the DOL ...... 1026
    B. The Counterclaims —The Farmworkers' Motion for Summary Judgment is Granted as to 1983 and 1985, and the Growers' Motion for Summary Judgment is Granted as to 1984 ... 1026
      1. Equitable Restitution Requires the Growers to Pay Back Wages for 1983, But Not for 1984 ....... 1028
      2. The Growers Must Pay Back Wages for 1985 as a Matter of Contract ............... 1030
    C. The Farmworkers' Motion for Certification of a Defendant Grower Class Shall be Granted as to 1985, But Denied Without Prejudice as to 1983 ................ 1031

### I. *Introduction*

This lawsuit is one in a sequence of separate actions arising from attempts by the Department of Labor ("DOL") over the last decade to regulate the compensation of alien migrant farmworkers. The issues at the core of this action have been before this Court, as well as the Court of Appeals for the District of Columbia, several times.

These issues have also been presented to federal courts in Virginia and West Virginia.[1] Indeed, it is apparent to the Court that this lawsuit is simply another chapter in a consistent and dedicated effort by groups including the plaintiffs, associations representing numerous fruit growers along the east coast (the "Growers"),[2] to evade obligations imposed by this Court in the prior suits. As discussed in further detail

1. A chronological list of the litigation pertinent to this action, with a summary of the results reached therein, is attached as Appendix A.

2. The plaintiffs in this action include both associations representing individual growers and several individual growers themselves.

below, the Court will not permit such a result.

Procedurally, there are now before the Court three motions for summary judgment—the defendant DOL's motion for summary judgment as against the plaintiff Growers, and what amount to cross-motions between the Growers and the defendant-intervenors regarding counterclaims interposed by the defendant-intervenors. The defendant-intervenors consist of a class of migrant farmworkers (the "Farmworkers") whose right to wages under DOL regulations are at issue for the years 1983, 1984 and 1985. Also before the Court is the Farmworkers' request for certification of a class of defendant Growers who might be subject to potential liability under the Farmworkers' counterclaim.

The Court has determined to grant DOL's motion for summary judgment; to grant the Farmworkers' motion for summary judgment as to 1983 and 1985; and to deny the Growers' motion for summary as to 1983, but to grant it as to 1984. The Court grants in part the Farmworkers' request for class certification, and denies the remainder without prejudice.

## II. *Facts*

Although the general facts underlying the Growers' complaint have been set forth in copious detail in this Court's prior opinions, as well as in the opinions of the Court of Appeals, it is useful to reiterate those facts as they bear upon the Court's decision here.

In 1978, the DOL adopted a regulation which requires growers who compensate migrant farmworkers by the piece (as opposed to an hourly or other time-based wage) to modify their piece rates annually to ensure that the aggregate wage paid to such workers will be "equal" to the DOL's minimum *hourly* rate paid to foreign workers.[3] The DOL originally interpreted this provision as requiring growers to hold productivity constant and to increase piece *rates* in order to ensure an aggregate equality between piece workers and hourly workers as the DOL's minimum hourly rate increases over time. Absent such an interpretation, growers could create a false equality by demanding that piece workers increase productivity in order to bring their aggregate wage up to that paid hourly workers.

In 1980, however, the DOL changed its position. In approving the applications of growers to employ migrant workers, and in a subsequent 1981 interpretive letter, the DOL effectively took the position that a grower could increase productivity, rather than piece rates, in order to satisfy his obligation to establish aggregate wage equality between piece and hourly workers.[4] In *NAACP v. Donovan*, 558 F.Supp. 218 (D.D.C.1982) (Richey, J.) ("*NAACP I*"), this Court rejected the DOL's interpretation.[5] The plaintiffs in this action were not parties to that proceeding, and the DOL did not appeal from this Court's ruling. However, the DOL only applied the ruling of *NAACP I* to growers in West Virginia, the location of the workers on whose behalf

---

**3.** 20 C.F.R. § 655.207(c). This provision was amended on April 9, 1987. 52 Fed.Reg. 11460 (1987). However, this amendment occurred after all of the events at issue here took place and is not relevant to this lawsuit.

**4.** Throughout this opinion, the lower piece rate permitted under the DOL's 1980 letter interpretation shall be termed, in accordance with technical details not germane to this decision, the "average worker piece rate." The higher rate required under the decisions of this Court shall be referred to as the "proportional piece rate."

**5.** As detailed in *NAACP I*, in 1980 the DOL approved the applications of several growers to pay piece rates to workers that were based on

an expected productivity of 80 *boxes* of apples per day. Previously, the DOL had only approved rates based on an expected productivity of 80 *bushels* per day. Because boxes are approximately 12% larger than bushels, the conversion from bushels to boxes to bushels forced the workers to increase productivity by at least that amount if they were to make the same wage in 1980 that they made in 1979. *NAACP I*, 558 F.Supp. 218, 221–22 (D.D.C.1982). Simply put, the conversion from boxes to bushels, and the fact that the growers sought to pay the same wage for a box as they had paid for a bushel, was—and essentially remains—at the heart of the dispute.

the suit had been brought.[6]

Because the DOL gave this Court's ruling in *NAACP I* such limited effect, the plaintiffs returned to this Court. In *NAACP v. Donovan*, 566 F.Supp. 1202 (D.D.C.1983) (Richey, J.) ("*NAACP II*"), this Court, among other things, expanded the scope of *NAACP I* to include states other than West Virginia.

Apparently uncomfortable with the trend of litigation, and in compliance with an order of a federal district court in Virginia,[7] the DOL determined to cure the problem in 1983 by promulgating a new rule. The new rule was intended to embody the average worker piece rate formula—rejected by this Court in *NAACP I* and *NAACP II*—and would have permitted growers to establish wage equality between foreign piece and hourly workers by requiring increased productivity. In an unpublished order dated September 8, 1983, this Court enjoined enforcement of the new rule, and directed growers to either pay the higher rates under *NAACP I* and *NAACP II* or place the difference into an escrow account. However, the Court of Appeals for the District of Columbia dissolved the injunction, and remanded the matter to this Court to determine the propriety of DOL's rulemaking procedure under the APA.

*NAACP v. Donovan*, 737 F.2d 67 (D.C.Cir. 1984) ("*NAACP III*").

On remand, this Court approved the DOL's rulemaking procedure, and validated the DOL's average worker piece rate rule. As a result, while this decision was on appeal, the DOL permitted compliance with the new rule in growers' 1984 job clearance orders. However, after the job clearance orders were approved, and average worker piece rates paid thereunder, the Court of Appeals reversed the decision of this Court as to the validity of the DOL's rule under the APA. *NAACP v. Donovan*, 765 F.2d 1178 (D.C.Cir.1985) ("*NAACP IV*"). On remand, this Court reiterated the applicability of the prior rulings in *NAACP I* and *NAACP II*, and ordered that they be given prospective application. *NAACP v. Brock*, No. 82–2315 (D.D.C. August 14, 1985).[8] As a result, average worker piece rates were paid to piece workers in 1984, but under an invalid rule.

The plaintiffs in this action (the Growers) were never parties to any of the litigation that took place in this Court.

In 1985, the Growers filed their job clearance orders with the DOL, promising to pay the proportional piece rate in the event the Court of Appeals and this Court determined that such payments would ultimately be appropriate.[9] The growers subsequent-

---

**6.** The DOL did *not* require growers in other areas around the country to promise to pay the proportional piece rate under 20 C.F.R. § 655.207(c), but instead required such a promise only from growers in West Virginia. DOL extracts a wage promise from growers in the form of annual "job clearance orders". Before an grower may employ foreign workers, the grower must submit a job clearance order under 20 C.F.R. § 653.501 which specifies the terms and conditions of employment, including the method of calculating piece rates. In only the West Virginia growers' job clearance orders for 1983, prior to *NAACP II*, did the DOL require compliance with the Court's ruling in *NAACP I*; in the job clearance orders from growers located elsewhere, the DOL permitted payment of average worker piece rates—the interpretation expressly rejected in *NAACP I*.

**7.** *Kent Barley, Inc., et al. v. Donovan*, Civ. No. 83–0079 (W.D.Va. Aug. 8, 1983). The *Kent Barley* action appears to have been the first of the series of collateral attacks launched against this Court's decisions in *NAACP I* and *NAACP II* by groups which included the Growers.

**8.** The Order provides:

The Department of Labor's final rule published in the Federal Register on September 2, 1983, to the extent that it purported to amend 20 C.F.R. § 655.207(c), is hereby vacated and declared to be of no force and effect. Section 655.207(c) of 20 C.F.R., as published on March 10, 1978 and as interpreted by this Court in *NAACP v. Donovan*, 558 F.Supp. 218 (D.D.C.1982); *NAACP v. Donovan*, 566 F.Supp. 1202 (D.D.C.1983), is hereby reinstated unless and until modified, amended, or revoked by valid rulemaking.

*NAACP v. Donovan*, No. 82–2315 (D.D.C. August 14, 1985) [1984 WL 3184].

**9.** In an amendment to their job clearance orders, the Growers agreed as follows:

The employer will pay piece rates for the remainder of the season at least equal to those required by 20 C.F.R. 655.207(c) as published on March 10, 1978, and as interpreted by the court in *NAACP, Jefferson County v. Donovan*, 566 F.Supp. 1202 (D.D.C.1983).

Pl.Comp. at ¶ 32–33.

ly submitted letters to the DOL stating that they would pay the proportional piece rates "under protest" because:

> The growers understand that, unless they execute these documents, their job orders will not be accepted by the Department of Labor for recruitment of United States workers nor will the growers' certifications for temporary foreign labor certifications be approved. We further understand that the Department of Labor will not accept a statement of protest on the face of the job order and therefore that a separate letter is the proper vehicle for entering such a protest.
>
> Accordingly, you are hereby advised that the growers in no way waive their right to challenge the contents of this amendment, administratively or in the courts, and, if successful, the growers reserve the right to amend their job orders accordingly.

Pl.Comp. at ¶ 33. In fact, following this Court's assertion of the continuing validity of *NAACP I* and *NAACP II* on August 14, 1985, the Growers did *not* pay the proportional piece rate. Instead, when reminded of their obligations to do so, the Growers filed this suit.[10]

With this action, the Growers specifically challenge, under the APA, the DOL's actions in seeking to enforce the payment of the higher wage rate in 1985. The Growers contend that the DOL's actions in requiring adherence with *NAACP I* and *NAACP II* in 1985 were "arbitrary, capricious, contrary to law, and an abuse of discretion." As a practical matter, of course, the Growers' broader goal is to challenge the accuracy and continuing validity of this Court's rulings in *NAACP I* and *NAACP II.* Excusing themselves from the direct mandate of these rulings

by virtue of the fact that they were not parties to the litigation, the Growers seek a declaration from this Court that the DOL's earlier average worker piece rate interpretation of 20 C.F.R. § 655.207(c)—an interpretation expressly repudiated in *NAACP I*—controls their wage obligations with respect to 1985, as well as in the future.[11]

After the suit was filed, a group of migrant workers (the Farmworkers) intervened as defendants. As defendant-intervenors, the Farmworkers interposed counterclaims against the Growers for back piece-rate wages under *NAACP I* and *NAACP II* (the proportional piece rate) for the years 1983, 1984 and 1985. In addition to their claims against the Growers, the Farmworkers also seek certification of a defendant class of agricultural employers for purposes of liability under their counterclaim. The Farmworkers request certification of a class under Fed.R.Civ.P. 23(b)(2), the members of which would consist of all agricultural employers who were members of the plaintiff associations in 1985 and who paid the lower rates in 1983, 1984 or 1985. The Growers have stipulated to such a class, but only as to 1985; they object to any class which would include employers who paid the average worker piece rate in 1983 or 1984.

Everyone has moved for summary judgment. As noted above, the Court grants the DOL's motion as against the Growers; grants the Farmworkers' motion as against the Growers for 1983 and 1985; and denies the Growers' motion as against the Farmworkers as to 1983, but grants the Growers' motion as to 1984. The Court further certifies a defendant class for 1985, but denies without prejudice the Farmworkers' request for certification of a defendant class for 1983, and denies with prejudice certification of a class for 1984.

---

10. In keeping with their strategy of evading this Court and its rulings, and instead launching collateral attacks on this Court's rulings elsewhere, the Growers originally filed this action in the Western District of Virginia. The action was later transferred here after various procedural and dispositive motions had been filed.

11. The Growers contend that this Court must determine the prospective applicability of

*NAACP I* and *NAACP II* insofar as the DOL's amendment, referred to at footnote 2, which would otherwise render the prospective operation of § 655.207(c) and the rulings of this Court moot, is currently under challenge. As of this writing, that challenge is before Judge Sporkin of this Court, and has not been resolved. *See, e.g., AFL–CIO v. Brock,* 835 F.2d 912 (D.C. Cir.1987).

III. *Discussion*

A. The Original Action—Summary Judgment is Granted in Favor of the DOL

In challenging the DOL's actions with respect to the Growers' 1985 obligations, the Growers seek a declaration that the DOL has acted in a manner which was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and thus in violation of § 706(2)(A) of the APA. They also ask that the DOL be enjoined from demanding proportional piece rate payments in the future.

■■■ As to 1985, the DOL did not violate the APA because, in directing the proportional piece rate payments, the DOL was merely complying with an express directive of this Court. After the remand of *NAACP III*, this Court unambiguously directed the DOL to apply 20 C.F.R. 655.-207(c) in a manner consistent with the decisions in *NAACP I* and *NAACP II*. Thus, this Court's Order expressly reinstated the law as it had existed prior to the DOL's attempted rulemaking in 1983, and expressly directed that the DOL should apply that law "unless and until modified, amended, or revoked by valid rulemaking." *NAACP v. Donovan*, No. 82–2315 (August 15, 1985). Because the Court of Appeals held in *NAACP IV* that such "valid rulemaking" had not taken place, the DOL's efforts to enforce the dictates of *NAACP I* and *NAACP II* were in no way arbitrary, capricious or not in accordance with law. Instead, particularly given that the DOL had no choice *but* to comply with this Court's Order, the DOL acted in a perfectly responsible and appropriate manner. *See, e.g., GTE Sylvania, Inc. v. Consumers Union*, 445 U.S. 375, 386, 100 S.Ct. 1194, 1201, 63 L.Ed.2d 467 (1980) ("persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order"). An agency acting on the express instructions of a federal court simply can-

not be deemed to have violated the APA; at the very least, the agency cannot be deemed to have acted in an arbitrary or capricious manner. *Cf., American Federation of Gov. Emp. v. Block*, 655 F.2d 1153 (D.C.Cir.1981) (agency permitted to dispense with APA notice and comment when complying with order of federal court).

■■■ The Growers' request for prospective relief (as distinguished from their 1985 APA challenge) raises in a very direct fashion the Growers' challenge to *NAACP I* and *NAACP II*. Although the DOL contends that the Growers' argument as to the prospective application of *NAACP I* and *NAACP II* is moot, in light of DOL's recent rulemaking on this issue, the continued uncertainty and litigation over the rule's validity counsels against a finding of mootness. *See AFL–CIO v. Brock*, 835 F.2d 912 (D.C.Cir.1987) (requiring DOL to offer more detailed reasons for change of policy embodied in new rule). Nevertheless, the Court finds that the Growers are not entitled to prospective relief from the rulings in *NAACP I* and *NAACP II* because, while perhaps not participants in that litigation, the Growers are bound by the results of those actions under principles of collateral estoppel.

When a party has notice of an action which may dramatically affect its interests, that party cannot without consequence sit idly by and refuse, for strategic reasons, to participate in that action. Although it is true that a party bears no general duty to intervene, *Chase Nat'l Bank v. City of Norwalk*, 291 U.S. 431, 441, 54 S.Ct. 475, 479, 78 L.Ed. 894 (1929), the compelling interests of finality in federal litigation, coupled with the implicit suggestion that to protect one's interests a party must act when those interests are first endangered,[12] has led several courts to conclude that a failure to intervene when the opportunity presents itself may result in the loss of any right to collaterally attack the judgment rendered in the prior action. *Nat'l Wildlife Fed. v. Gorsuch*, 744 F.2d 963 (3d

---

**12.** To this extent, the analysis employed seems to implicate the concerns underlying the eq- uitable doctrine of laches.

Cir.1984); *Safir v. Dole*, 718 F.2d 475, 481–83 (D.C.Cir.1983). In this Court's view, the concerns which justify such an estoppel—particularly that of finality—are magnified when, as here, the subject matter at issue implicates not merely private interests, but the administration of a substantial administrative program.

In this case, the Growers had ample notice of both *NAACP I* and *NAACP II*, and were well aware that the resolution of those actions would have a profound impact upon their interests. Yet, the Growers—for strategic reasons—made no effort to participate in the resolution of the difficult and controversial questions presented in those cases. Although the Court recognizes that the basis of its holding is one which should be used sparingly, the Court nevertheless holds that under the circumstances of this case the Growers are now collaterally estopped from attacking the results reached in *NAACP I* and *NAACP II*.

Parties should not be allowed to play games with federal courts; when a federal court decides a matter, particularly one involving the validity of an administrative practice which regulates conduct nationwide, finality concerns demand that the decision be given some weight.

Here, however, the Growers seek, in effect, to play games with the system under the guise of "strategic litigation." The Growers were well aware of the pendency of the lawsuit which produced the decision in *NAACP I*.[13] They knew full well that the subject matter of the suit was of vital importance to their economic interests. Yet, they chose to stand on the sidelines. The reasons for the Growers' inaction are not difficult to discern. The Growers wanted to preserve their right to take two bites at the apple. They felt perfectly comfortable with the DOL's ability to defend its practice respecting piece rates, and therefore stood aside in hopes that the DOL would prevail in *NAACP I*. Had the DOL prevailed, the Growers' interests would have been protected without any ef-

fort on their part. Yet, the decision not to participate, in the Growers' view, preserved their right to launch successive, and potentially infinite, collateral challenges to *NAACP I* in the event of an adverse decision. In fact, this is precisely what has happened.

The federal judicial system should not be forced to tolerate such a result. Parties should not be permitted to trifle with the system in order to manufacture for themselves a "no lose" situation. Single decisions by federal courts, particularly in the administrative context, necessarily impact upon a broad array or parties and interests; indeed, some have suggested that in certain settings federal litigation is more akin to regulatory action. *See, e.g.,* Chayes, *The Role of the Judge in Public Law Litigation,* 89 Harv.L.Rev. 1281 (1976). While neither accepting nor rejecting such a view of the role of a federal court, the Court does note that a decision in this context is meaningless unless it is final; such a decision is without value unless it can be reasonably free of strategic collateral attack from those, necessarily large in number, who may be inconvenienced by its result. The current chaos surrounding the DOL's piece rate regulations—almost entirely a product of strategic attacks upon *NAACP I* and *NAACP II* brought by the Growers and others in different courts—is a testament to this point.

The Court recognizes the due process implications of a finding of collateral estoppel here. The Growers were *not* parties to *NAACP I* or *NAACP II*, and the Court appreciates as well as they the maxim that every man is entitled to his day in court. Yet, as a practical matter, under Rule 24 the Growers were given their day in Court, but, for strategic reasons, they decided not to show up. Due process does not, or at least should not, be read to grant every party with a crafty lawyer the right to embroil the federal courts in a mess of wasteful and repetitive litigation. That is the very point of intervention under Rule

13. Indeed, the Farmworkers assert in their Statement of Material Facts Not in Dispute that counsel for the Growers was in the courtroom during the pivotal hearing which led to the *NAACP I* decision. Int. St. at ¶ 6. The Growers have offered nothing to rebut this claim.

24. The Growers could have participated in *NAACP I;* indeed, the Court would have appreciated their participation. For strategic reasons, the Growers chose not to do so. In this Court's view, by so doing they forfeited their right to challenge the result. The Court finds the Third Circuit's views in *Gorsuch* directly applicable here:

> "Clearly, plaintiffs were not outsiders unaware of litigation in progress that would ultimately affect their interests. In a deliberate choice of litigation strategy, they chose to stand on the sidelines, wary but not active, deeply interested, but of their own volition not participants. Although plaintiffs may not have had their day in court as litigants, they had the opportunity and for reasons of their own adopted a different approach. Plaintiffs cannot, at this stage, assert persuasively that the interest of finality should not prevail."

744 F.2d at 972.

Because the Growers are collaterally estopped from challenging the results of *NAACP I* and *NAACP II,* summary judgment shall be granted in favor of the DOL with respect to the prospective application of 20 C.F.R. § 655.207(c) as interpreted in those decisions.

**B. The Counterclaims—the Farmworkers' Motion for Summary Judgment is Granted as to 1983 and 1985, and the Growers' Motion for Summary Judgment is Granted as to 1984**

As defendant-intervenors, the Farmworkers have brought counterclaims seeking back wages for the years 1983, 1984 and 1985. As a technical matter, the conclusion reached above—that the Growers are collaterally estopped from challenging the *results* of *NAACP I* and *NAACP II*—does not dispose of the Growers' actual wage obligations in the years 1983, 1984 and 1985. Because the Orders issued in those cases expressly bound only the DOL, the viability of the Farmworkers' counterclaims depends upon the specific facts sur-

rounding the Growers' job claim orders in those years. For the reasons described below, it is more appropriate to treat the Growers' obligations with respect to the years 1983 and 1984 together, and to treat the year 1985 separately.

**1. *Equitable Restitution Requires the Growers to Pay Back Wages for 1983, But Not for 1984***

In 1983, the DOL required all growers submitting job clearance orders to commit to the payment of the proportional piece rate, but only until the DOL could promulgate a valid rule expressly authorizing payment of the average worker piece rate. On September 2, 1983, the DOL promulgated that rule. On September 8, 1983, this Court enjoined DOL from giving effect to the new rule, and directed DOL to withhold certification from any grower who failed to either (i) pay the proportional piece rate (under *NAACP I* and *NAACP II*) for the remainder of 1983, or (ii) place the difference between the proportional piece rate and average worker piece rate into escrow. As noted above, this Order was overturned by the Court of Appeals in *NAACP III.* However, notwithstanding that reversal, in July of 1985 the Court of Appeals finally invalidated the DOL's new rule in *NAACP IV.* 765 F.2d 1178 (D.C.Cir.1985).

In 1984, the DOL, in reliance upon the new rule—which, as described above, had not yet been invalidated[14]—did not require growers to commit to the higher piece rates under *NAACP I* and *NAACP II* in their job clearance orders. Accordingly, no growers—including the plaintiffs here—paid the higher rates during 1984. The question for decision, then, is whether the Growers are obligated to provide the Farmworkers with back pay for the latter portion of 1983 (for the period following promulgation of the DOL's rule on September 2, 1983), and for all of 1984.

The Court finds that the Growers must provide back pay for the pertinent portion of 1983, but that the Growers shall not be required to provide back pay for

---

**14.** Indeed, on the remand to this Court after *NAACP III,* this Court found the rule valid under the APA. This is the ruling that was in effect at

the time the DOL processed job clearance orders in 1984.

1984. The legal principle underlying the Court's decision is that expressed in *Democratic Central Comm. of D.C. v. Wash. Metrop. Area Transit Comm.*, 485 F.2d 786 (D.C.Cir.1973). In that case, the court noted that when funds have been either paid or withheld pursuant to an invalid administrative edict, the proper remedy is equitable restitution. 485 F.2d at 824 (relying upon *Williams v. Wash. Metrop. Area Transit Comm.*, 415 F.2d 922 (D.C.Cir. 1968)). However, because the restitutionary remedy is a matter of equity, reimbursement of funds will be required "only to the extent that justice between the parties requires." 485 F.2d at 825 (quoting *Williams*, 415 F.2d at 944). Equity will require such a result "only when the money was obtained in such circumstances that the possessor will give offense to equity and good conscience if permitted to retain it." 485 F.2d at 825 (quoting *Williams*, 415 F.2d at 944).

Here, the dictates of equity suggest that the Growers should be required to pay the full amount owing under *NAACP I* and *NAACP II* for 1983, but not for 1984.

As to both years, the Growers' sole justification for paying the average worker piece rate—for part of the year in 1983 and for the entirety of 1984—was the existence of the DOL's new regulation, later found to be invalid. In 1983, however, at the time the Growers (at least those that actually did so [15]) decided to pay the average worker piece rate and forego escrow payments, they did so in direct violation of this Court's Order of September 8, 1983. Moreover, in light of that Order, even those that placed the funds in escrow did so knowing full well that the DOL's rule was, if not flatly invalid, of at least dubious validity. Further, to the extent any of the Growers failed to pay the proportional piece rates *before* issuance of the DOL's regulation—on the expectation that it would be issued [16]—they did so in violation of the DOL job clearance order issued with respect to that year. Under these circumstances, equity simply will not permit the Growers to retain funds wrongfully withheld during 1983.

The year 1984, however, presents a different issue. In accepting job clearance orders for 1984, the DOL did *not* require—as it had in 1983—compliance with *NAACP I* and *NAACP II*. Instead, based upon the fact that this Court's September 8, 1983 ruling had been reversed by the Court of Appeals in *NAACP III*, the DOL merely required that growers commit to compliance with DOL's new regulation in setting piece rates. Accordingly, in paying the average worker piece rates during 1984, the Growers had no particular reason to believe or suspect that they were acting improperly. Instead, the decision in *NAACP III*, coupled with this Court's ruling on the remand of *NAACP III*, provided the Growers with a perfectly reasonable basis for believing that they were acting in complete compliance with the law in paying the average worker piece rates. At least during 1984, the Growers, in their job clearance orders, had not committed to payment of anything else, and the law *then in effect* required payment of no more. In light of these facts, the Court finds that equity— "justice between the parties"—does not require restitution of the amounts improperly withheld during 1984.[17]

**15.** It is not clear which of the plaintiff growers actually complied with the Court's Order of September 8, 1983, by either paying the proportional piece rates or by placing the difference in escrow. Only those that continued to pay the proportional piece rates, under *NAACP I* and *NAACP II*, will escape liability under the decision announced herein.

**16.** In *Kent Barley, see supra* note 7, Judge Turk had ordered the DOL to promulgate the new average worker piece rate regulation prior to September 1, 1983. Thus, the DOL may have approved the job clearance orders of a number of growers, and payments may have been made, prior to promulgation of the new rule. However, any such prior payments would have been made under the 1983 job clearance orders then in effect, which required payment under the proportional piece rate formula.

**17.** The Farmworkers' counterclaims also seek back pay for 1984 (as well as for 1983) on the grounds that the Growers have violated the Wagner–Peyser Act and the regulations promulgated thereunder, as well as the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), and the regulations promulgated thereunder. Arguably, these claims would pro-

## 2. *The Growers Must Pay Back Wages for 1985 as a Matter of Contract*

■ The Growers' behavior in 1985 is fundamentally different than that in 1983 and 1984. In 1985, the Growers could not have reasonably believed that payment of the average worker piece rate was consistent with law. As noted above, following the Court of Appeals' decision in *NAACP IV*, the DOL expressly directed growers around the country, including the plaintiffs here, to amend their job clearance orders to include a promise to pay the proportional piece rate in the event *NAACP IV* became effective during the 1985 harvest. Although perhaps done "under protest" (and thereby implicitly conceding their *legal* obligations to pay the proportional piece rate) the Growers amended their job clearance orders as instructed. On August 14, 1985, by Order of this Court, *NAACP IV* became effective. Yet, notwithstanding the commitment made in their job clearance orders, the Growers refused to pay the proportional piece rate.

The Court holds that the Growers were bound to pay the proportional piece rate during 1985. It has been noted, properly in this Court's view, that the contents of a job clearance order under the Wagner–Peyser Act effectively constitute a contract between an employer and the employees subject to it. *Espinoza v. Stokely–Van Camp, Inc.*, 641 F.2d 535, 540 (7th Cir. 1981) (employer liable to employees if job clearance order misrepresents actual terms of employment); *Western Col. Fruit Growers Assoc. v. Marshall*, 473 F.Supp. 693, 696 (D.Colo.1979) ("Plaintiff's clearance order is essentially an offer for a contract of employment"; the contract may be accepted by individual employees).

Here, the undisputed facts indicate that the Growers amended their 1985 job clearance orders, in response to the DOL's di-

rective, solely in order to preserve their right to participate in the migrant farmworker program. That the Growers felt compelled to make the amendment—upon pain of non-participation in the program—reflects a complete understanding on their part that the promise of wages at the higher rate embodied an essential term of the contract, as to both the DOL and the Farmworkers. Quite simply, the Growers made a promise in 1985, and they failed to keep it. The Growers accepted the benefits of the migrant farmworker program, but reneged on their promise to pay the price of participation, a price clearly established by both the DOL and this Court. The direct losers, of course, are those least able to defend their interests—the Farmworkers. The Court regards the Growers' actions in 1985 as self-serving and duplicitous, and will not permit the Growers to profit by such behavior. The Growers will be held liable for the consequences of their broken promises.

The Growers seek to avoid their 1985 wage obligations by asserting that the the commitment to pay the proportional piece rate was (1) ambiguous, and therefore incapable of supporting contract liability, (2) made under protest, (3) made under duress, and (4) never relied upon by the Farmworkers.

The Court rejects each of the Growers' arguments. The Growers' promises in the amended 1985 job clearance orders were as unambiguous as it could possibly have been: the Growers promised to pay the higher rates, if and when they became legally obligated to do so. The language of the Growers' promise is clear, and it became effective when this Court issued its August 15, 1985 Order.

As to the Growers' contention that the 1985 commitments were made under pro-

---

vide an alternative basis for receiving back pay even if the restitutionary remedy detailed above might not. However, in light of the fact that the Growers, at least in 1984, were acting in accordance with DOL's interpretation of applicable law, the Court is unwilling to find that the Growers violated either a statutory or regulatory scheme in that year. Further, it is at least questionable whether the Farmworkers enjoy a

private right of action to enforce alleged violations of the Wagner–Peyser Act. *Compare Gomez v. Florida State Employment Service*, 417 F.2d 569 (5th Cir.1969) (private right of action exists under Wagner–Peyser Act), *with De La Fuente v. Stokely–Van Camp, Inc.*, 514 F.Supp. 68 (C.D.Ill.1981), *aff'd on other grounds*, 713 F.2d 225 (7th Cir.1983) (no private of action under Wagner–Peyser Act).

test, the language of the protest letters themselves makes clear that the Growers merely reserved the right to "challenge the contents of [the] amendment, administratively or in the courts." [18] The Growers stated that "if successful" in such a challenge, they "reserve the right to amend their job orders accordingly." However, nowhere in the protest letters do the Growers reserve the right *not to pay the wages* to which they had committed themselves in the 1985 job clearance orders as those wages became due. The letters merely reserved the right to lodge a subsequent challenge to the legal propriety of the DOL's position (in essence, to the propriety of *NAACP I* and *NAACP II*). In sum, the Growers claim that the protest letters overrode the job clearance order, that the letters granted the Growers *carte blanche* to ignore the commitment made in the job clearance order. The very language of the letters belies this claim. Moreover, even if the letters were framed as the Growers contend, the Growers' position—both as to its argument that the job clearance orders were accepted under protest and that they were agreed to under duress—simply finds no support in the law. *Matter of Penn Central Transp. Co.*, 831 F.2d 1221, 1231 (3rd Cir.1987) ("Clearly, Penn Central cannot, with full knowledge of the facts, accept the benefits of [a regulatory contract] and then ... attempt to take an inconsistent position in order to avoid its obligations under those contracts."); *Kaneb Services, Inc. v. Federal Savings and Loan Ins. Corp.*, 650 F.2d 78, 81 (5th Cir.1981) ("It is recognized that under the doctrine of equitable estoppel a party with full knowledge of the facts, which accepts the benefits of a transaction, contract, statute, regulation, or order may not subsequently take an inconsistent position to avoid the corresponding obligations or effects.").

The Court further rejects the Growers contention that they cannot be liable for 1985 because none of the Farmworkers saw or relied upon the promise of higher wages. Even if true, the Court regards this fact as irrelevant. The terms of a job clearance order which reflect DOL requirements become a part of the employment contract as a matter of law. *Salazar–Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334, 1342 (5th Cir.1985). An employer is expressly obligated to make those terms clear to his employees. *id.* at 1342. The fact that the Growers may have failed to do so, or that for whatever reason the Farmworkers may never have been aware of the job clearance order amendment, in no way minimizes the Growers' contractual obligation in this context.

Because the Growers made a contractual commitment to pay the higher wage in 1985, and because they failed to do so, the Growers shall be liable to the Farmworkers for the difference between the amounts owed under the proportional piece rate formula and the amounts actually paid in that year.

C. The Farmworkers' Motion for Certification of a Defendant Grower Class Shall be Granted as to 1985, But Denied Without Prejudice as to 1983

As noted above, the Farmworkers have moved for the certification of a defendant class of Growers who might be liable on the Farmworkers' counterclaims. The Farmworkers seek to certify, under Fed.R. Civ.P. 23(b)(2), a class which would include all members of the plaintiff associations in 1985 who paid the lower wages during the years 1983, 1984 or 1985.[19] The Growers have stipulated to such a class with respect to 1985. As noted above, however, the Court has concluded that the Growers shall not be liable with respect to 1984. At this juncture, then, the question is whether the Court should certify, under Rule 23(b)(2), a

---

**18.** The pertinent portion of the protest letter is set forth above in the text at page 1025.

**19.** As an alternative to class certification, the Farmworkers sought to join as counterclaim defendants, under Fed.R.Civ.P. 19, each grower member of the plaintiff associations. In light of the fact that the joinder motion drew no distinc-

tion between growers who had paid the average worker piece rate and those who had paid the proportional piece rate, and in light of the parties' subsequent partial agreement as to the scope of a class, the Farmworkers' Rule 19 motion is denied.

class of association members who paid the lower wages in 1983 and 1985.

Recent developments in the law have complicated the matter somewhat. In *Henson v. East Lincoln Township*, 814 F.2d 410 (7th Cir.1987), Judge Posner held, in what was apparently the first opportunity for close consideration of the issue at the appellate level, that certification of a defendant class is never permissible under Rule 23(b)(2). The United States Supreme Court has granted *certiorari*. —— U.S. ——, 108 S.Ct. 283, 98 L.Ed.2d 244 (1987). Accordingly, it appears to be the law—in at least the Seventh Circuit, and without reasoned contrary appellate authority—that Rule 23(b)(2) does not contemplate a defendant class of the type sought here. *See, e.g., Williams v. State Bd. of Elections*, 696 F.Supp. 1563, 1573 (N.D.Ill.1988).

On the other hand, the Court notes that prior to *Henson* it was common practice to certify defendant classes under Rule 23(b)(2). H. Newberg, *Newberg on Class Actions*, § 4.64 (2d ed.1985). Further, in light of the Supreme Court's grant of *certiorari* in *Henson*, it can fairly be said that the propriety of a defendant class under Rule 23(b)(2) remains an open question. However, it appears that several courts have certified defendant classes under Rule 23(b)(2) *since* the decision in *Henson*. *See, e.g., Nat'l Broadcasting Co., Inc. v. Cleland*, 697 F.Supp. 1204, 1217 (N.D.Ga. 1988); *United States v. Rainbow Family*, 695 F.Supp. 314, 321 (E.D.Tex.1988).

■ Because the Court's present authority to certify a defendant class under Rule 23(b)(2) is uncertain, the Court has determined to take a middle course on the issue. As to 1983, given that the parties are in sharp dispute as to the propriety of certifying a defendant class for that year, the Court will deny the Farmworkers' motion, but without prejudice. Once the Supreme Court disposes of *Henson*, the Farmworkers may renew their request for class certification as to 1983 in light of the Supreme Court's disposition, and the Court will retain jurisdiction to entertain such a request.

As to 1985, however, the Court will give effect to the stipulation of the parties, and will certify a defendant class. In light of the presently uncertain legal environment, the Court views the agreement of the parties as having substantial weight, and finds it proper under these circumstances to certify a defendant class under Rule 23(b)(2). In accordance with the parties' stipulation, this defendant class will consist of all "1985 employer members of the plaintiff associations (other than the New Hampshire grower members of the New England Apple Council) who were certified to employ H–2 workers and who paid their fruit pickers piece rates that did not conform to the proportional increase interpretation of 20 C.F.R. § 655.207(c) in the year *1985*."

This resolution of the class certification question, coupled with the liability determination made above, gives the Farmworkers the right to immediately obtain back wages for 1985 from the members of the certified class. As to 1983, however, the Farmworkers must await the Supreme Court's disposition of *Henson*. Obviously, the Farmworkers will have the right under this decision to immediately obtain back wages from those individual growers who are plaintiffs in this action *and* who failed to pay the proportional piece rate in 1983. The Farmworkers must wait, however, before they may obtain 1983 back wages from growers who were members of the plaintiff associations in 1985, but who were not also individual plaintiffs here.

An Order in accordance with the foregoing shall be issued of even date with this Opinion.

## APPENDIX A

Prior litigation referenced in and relating to the issues raised in *Frederick County Fruit Growers, et al. v. McLaughlin*, 703 F.Supp. 1021 (D.D.C.1989) (opinion by Richey, J.).

1. *NAACP v. Donovan*, 558 F.Supp. 218 (D.D.C.1982) (Richey, J.) (*NAACP I*). In *NAACP I*, the District Court for the District of Columbia first rejected the Department of Labor's interpretation of 20 C.F.R. § 655.207(c) that would have allowed employers to require increased productivity as a means of establishing aggregate wage equality between piece and hourly foreign migrant workers.

2. *NAACP v. Donovan*, 566 F.Supp. 1202 (D.D.C.1983) (Richey, J.) (*NAACP II*). In *NAACP II*, the District Court for the District of Columbia extended the scope of *NAACP I* to states other than West Virginia, and required the annual issuance of Adverse Effect Rates.

3. *Kent Barley, Inc. v. Donovan*, No. 83–0079 (W.D.Va. Aug. 8, 1983) (Turk, J.). The Court in *Kent Barley* directed the Department of Labor to issue final piece rate regulations no later than September 1, 1983, and permitted employers to amend their job clearance orders in conformance with those regulations once issued.

4. *NAACP v. Donovan*, No. 82–2315 (D.D.C. Sept. 8, 1983) (Richey, J.). In an unpublished Order, the Court enjoined application of the Department of Labor's new piece rate regulations.

5. *NAACP v. Donovan*, 737 F.2d 67 (D.C. Cir.1984) (*NAACP III*). The Court of Appeals for the District of Columbia reversed this Court's Order of Sept. 8, 1983.

6. *NAACP v. Donovan*, No. 82–2315 (D.D.C. August 15, 1984) (Richey, J.). In an unpublished Order, the Court determined that the Department of Labor's new piece rate regulations had been validly promulgated under the APA.

7. *NAACP v. Donovan*, 765 F.2d 1178 (D.C.Cir.1985) (*NAACP IV*). In *NAACP IV*, the Court of Appeals for the District of Columbia reversed this Court's August 15, 1984, determination that the Department of Labor had validly promulgated the new piece rate regulations.

8. *NAACP v. Donovan*, No. 82–2315 (D.D.C. August 15, 1985) (Richey, J.). In an unpublished Order, this Court, in compliance with *NAACP IV*, held the Department of Labor's new piece rate regulations invalid and reinstated the prior regulations as construed in *NAACP I* and *NAACP II*.

9. *Feller v. Brock*, 802 F.2d 722 (4th Cir. 1986). The Court of Appeals for the Fourth Circuit reversed a decision by the District Court for the Northern District of West Virginia (Maxwell, J.) which would have directed the Department of Labor to certify job clearance orders for employers in 1985 on a basis contrary to that specified in *NAACP I* and *NAACP II*.

## ORDER

In accordance with the Opinion of the Court issued of even date herewith, it is, by the Court, this 14th day of January, 1989,

ORDERED, that the Motion for Summary Judgment filed by the defendant Department of Labor (the "DOL") against the plaintiffs shall be GRANTED in all respects, and the complaint filed by the plaintiffs (the "Growers"), insofar as it seeks relief as against the DOL, shall be dismissed and removed from the dockets of this Court; and it is further

ORDERED, that the Motion for Summary Judgment filed by the defendant-intervenors (the "Farmworkers") as against the plaintiff Growers shall be GRANTED insofar as it relates to the Farmworkers request for back wages for the years 1983 and 1985, and such Motion shall be DENIED with prejudice insofar as it relates to the Farmworkers' request for back wages for the year 1984 and any other form of statutory or regulatory relief; and it is further

ORDERED, that the Motion for Summary Judgment filed by the Growers as against the Farmworkers shall be DENIED insofar as it relates to the Farmworkers' request for back wages for the year 1983, and such Motion shall be GRANTED insofar as it relates to the Farmworkers' request for back wages for the year 1984 and any other form of statutory or regulatory relief; and it is further

ORDERED, that the Farmworkers' request for certification of a defendant class shall be GRANTED insofar as it relates to 1985, with such class to be defined in accordance with the stipulation executed by the parties on March 15, 1988, and approved by this Court on March 31, 1988; however, insofar as the Farmworkers' request for certification of a defendant class relates to 1984, the request is DENIED, and, insofar as the request relates to 1983, the request is DENIED, without prejudice, pending a decision by the Supreme Court of the *Henson* case, now before it; and it is further

ORDERED, that, as appropriate in each individual case, the plaintiffs and any members of the defendant class certified herein shall be required to pay, to the members of the Farmworkers' intervenor class, as certified by Judge Kiser's Order of September 19, 1986, back wages for the year 1985, in an amount equal to the difference between the wages actually paid and wages calculated pursuant to the rulings of this Court in *NAACP v. Donovan*, 558 F.Supp. 218 (D.D.C.1982), and *NAACP v. Donovan*, 566 F.Supp. 1202 (D.D.C.1983); with respect to the plaintiffs herein, each shall be required to pay to the members of the aforementioned Farmworkers' intervenor class, as appropriate, back wages for the year 1983 calculated on the same basis; and it is further

ORDERED, that this Court shall retain jurisdiction over this matter for purposes of supervising, if necessary, the payment of back wages as directed herein, and for the purpose of ruling on such further class certification questions as may arise with respect to the year 1983.